UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TECHNICAL SALES ASSOCIATES, INC.,

    Plaintiff,

v.                                                                              Case Nos. 07-11745, 08-13365

OHIO STAR FORGE CO.,                                         HONORABLE AVERN COHN

    Defendant.

_____/

**MEMORANDUM AND ORDER
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I.  Introduction

This is a dispute over sales commissions which is the subject of two consolidated cases. Plaintiff Technical Sales Associates, Inc. ("TSA") is suing defendant Ohio Star Forge Company ("OSF") claiming a breach of a 2003 Sales Representative Agreement ("2003 Agreement"), case no. 08-13365, and a breach of a 2005 Sales Representative Agreement ("2005 Agreement"), case no. 07-11745. With respect to the 2005 Agreement, TSA makes the following claims, as set forth in the First Amended Complaint: Count I -breach of contract; Count II - declaratory judgment, and Count III - violation of Michigan's Sales Representative Commissions Act (SRCA), M.C.L. § 600.2961.

Before the Court is OSF's motion for summary judgment with respect to the 2005

Agreement.[1]

Also before the Court is TSA's motion for sanctions for destruction of electronic evidence and OSF's motion for contempt sanctions against TSA and Midwest Data Group, LLC (Midwest) for violations of the order allowing a computer forensic examination as well as a protective order.  Those motions are the subject of a separate order.

For the reasons that follow, OSF's motion for summary judgment will be denied.

## II.  Background

The material facts, viewed in a light most favorable to TSA, and as gleaned from the parties' papers follow:

TSA, a Michigan corporation with its principle place of business located in Livonia, Michigan, is an independent sales representative firm in the automotive industry.  Lawrence Bernhardt is the president and sole shareholder of TSA.

OSF, a Delaware corporation with its principle place of business located in Warren, Ohio, is a manufacturer of forged steel products.  OSF is owned by Daido Steel.

The parties' relationship reaches back to the 1990s.  The dispute in this case deals with two separate sales representative agreements entered into by the parties: the 2003 Agreement and the 2005 Agreement.  As noted above, the instant motions pertain only to events surrounding the 2005 Agreement.

On or about October 20, 2003, TSA and OSF entered into the 2003 Agreement.

---

[1]OSF addresses only Counts I and III.  Count II is essentially duplicative of Count I.

2

Under the 2003 Agreement, TSA was appointed as OSF's exclusive sales representative on various accounts.  OSF was obligated to pay TSA sales commissions.

On or about December 1, 2005, TSA and OSF executed a new sales representative agreement, the 2005 Agreement.  Similar to the 2003 Agreement, the 2005 Agreement identified exclusive accounts and set forth TSA sales commissions.  Significantly for the instant motion, the 2005 Agreement provides, inter alia, that "the Representative shall not conduct itself in any manner, which shall be detrimental to the Company's best financial, legal and commercial interest."  Px 1 - 200 Agreement at ¶ 2.

On April 18, 2007, OSF notified TSA that it was terminating the 2005 Agreement effective immediately.  The termination was the result of an incident at a dinner meeting between Bernhardt and Annette Marado, a representative of Timken steel, one of OSF's suppliers and the largest account TSA serviced for OSF.  Also present at the meeting were David Sprague, a TSA employee, Pat Billups of OSF, and Nick Zuzulo, Marado's financee.

Timken is comprised of three groups: the Automotive Group, the Industrial Group and the Steel Group.  The Automotive and Industrial Groups deal with the manufacture and sale of bearings and related products.  The Steel Group deals with the manufacture and sale of steel.  Marado is a sales representative in the Steel Group.  TSA worked to solicit orders for the sale of OSF's forging to the Automotive Group, which would be used in manufacturing bearings (the parties sometime refer to the work as being for Timken Bearing).  TSA says that all of the sales it procured for OSF through October 5, 2005 were sales to Timken Bearing.  OSF also apparently purchased steel from Timken Steel, although TSA was not involved in those dealings.  Marado is a sales

representative for Timken Steel and was responsible for selling product to OSF. Bernhardt says he had only minimal contacts with Timken Steel. At the time of the dinner meeting, Daido Steel (OSF's owner) had entered into a relationship with Timken to design and construct a new steel mill which eventually opened in November 2008.

The parties dispute the substance of the conversation between Bernhardt and Marado at the dinner. Marado maintains that she called the meeting in order to discuss inventory management issues; Bernhardt says he never knew the purpose of the meeting. Bernhardt says that before dinner, Marado questioned him about TSA's relationship with OSF, including how long TSA was under contract with OSF, who owned TSA, who were TSA's contacts at Timken. Bernhardt was upset at the questioning, interpreting it as an effort on the part of Timken to interfere with its relationship with OSF. Bernhardt also says that preciously other Timken employees had asked similar questions of him or other TSA employees regarding the relationship between OSF and TSA. Bernhardt admits that he spoke loudly to Marado in order to be heard above the restaurant noise. Bernhardt says that he informed Marado that his relationship with OSF was "none of her business" and he had enough of Timken trying to interfere in that relationship and he would not hesitate to sue Timken for tortious interference which would allow him to retire early. Bernhardt also made some other comments about alleged "dirt" he had on Timken employees. Bernhardt says that Marado was "speechless."

Marado says that Bernhardt threatened to sue Timken for 20 or 30 million dollars, accused a Timken employee of being a racist. She also says that she was "offended" by the comments. The next day, she reported the incident to her supervisor at Timken,

informing them that she was "appalled" by Bernhardt's "uncalled for" behavior. Marado also reported the incident to a Timken vice president and discussed it with Timken's legal counsel.

Billups of OSF, who was also present at the meeting, reported the incident to OSF's president, Jeff Downing. Downing phoned Marado to apologize. During that conversation, Marado told Downing that she did not understand why Bernhardt became "unwound" and was "loud and abusive." Downing also says that Marado "accepted the apology."

A few days later, OSF informed TSA that it was receiving calls from various Timken employees about the incident. According to Bernhardt, Downing told him that OSF was in "damage control mode." Downing also instructed Bernhardt to stop calling on Timken and asked Bernhardt to come see him.

An exchange of emails between Bernhardt and Downing on October 24, 2006 shows that OSF asked TSA to avoid all contact with Timken until January 2007 and focus on other accounts. TSA agreed to do so. Downing also suggested Bernhardt apologize to Marado.

Bernhardt says he called Marado the next day and offered an apology. He says that Marado said she was not offended by anything at the dinner meeting. Later that day, Bernhardt memorialized his conversation with Marado in an email to Downing.

Things apparently moved without much incident between OSF and TSA until about five months later, in March of 2007. During that time, the parties were working on revising their agreement. However, on March 8, 2007, OSF, through Downing, sent Bernhardt an email stating that it was removing TSA from Timken representation as a

result of Bernhardt's conduct at the dinner meeting and was considering whether to terminate the entire relationship or just the Timken account. The letter stated in part:

> Your proposal does not address the problem that I have with your representation at Timken. Your outburst at Annette Marado at the dinner last fall has not been forgotten either at Timken or OSF. Following that incident I instructed you to discontinue your OSF representation at Timken until we could decide how to handle this situation. In my judgement [sic], the risk of injecting you back into Timken representation is too great. It seems that you have too much anger at Timken and Timken personnel stemming from failed representation agreements prior to OSF, and I can't be sure these issues won't resurface and manifest into another incident.
> Your actions have put us in a situation which dictates that I permanently remove TSA from Timken representation. We are prepared to honor the contractual agreements, as I understand them, regarding Timken commissions. The only question in my mind is whether to terminate the entire representation agreement or just the Timken portion.

On March 14, 2007 Downing and Bernhardt discussed the future relationship between OSF and TSA. The conversation is memorialized in part in a March 20, 2007 email from Bernhardt to Downing. In the email, TSA stated rather than debate whether the dinner incident "constitutes a valid cause for termination" TSA proposed a "go-forward plan," which included a proposal for post-termination commissions on Timken products which OSF says are higher than those set forth in the 2005 Agreement.

On April 18, 2007, Downing wrote to Bernhardt stating it was terminating the parties' relationship. The letter states in relevant part:

> . . . Unfortunately, I don't think you understand the problem you have caused for OSF. We have been told that your conduct at Timken has made you unacceptable to Timken management. ***OSF could risk its relationship at Timken by trying to bring you back into the relationship***. As I have told you, the Timken purchasing people have asked us to remove you from the account. ***Basically instead of enhancing our sales opportunities with Timken, you have placed them in jeopardy***. In your letter you suggest an amendment to our agreement for a new three years so that you could represent us on other accounts. If your

> failure at Timken were an isolated incident based on an understandable and unique personality conflict we might consider this proposal. Unfortunately, it was not that but was a basic business failure in representing a client to a valued customer. In addition, we have been informed that you have had similar problems with customers of other clients you have represented. We can't take the risk this will reoccur with our other customers.
> 
> Although under the OSF-TSA agreement TSA is appointed exclusive OSF representative for a substantial number of customers, Timken is the only account which has generated any meaningful amount of sales.
> 
> Larry, you and I have a good personal relationship and I hope the it can continue, but after careful consideration, I regrettably have concluded that ***TSA has defaulted badly in its representation of OSF, and OSF must terminate TSA as a sales representative***. In accordance with our contract we are reducing you commission to the rates set forth in Attachment C.…

(Emphasis added).

The next day, April 19, 2007, TSA filed the 2007 Action in federal court claiming breach of contract regarding the 2005 Agreement. TSA asserted federal jurisdiction based on diversity of citizenship and seeks damages in excess of $75,000.00. TSA later filed a motion to amend the complaint to add a claim under the SRCA. OSF opposed the motion. The Court granted the motion. See Order filed April 14, 2008.

Despite the litigation, the parties continued to communicate and work toward "reestablishing their relationship." OSF initially proposed the reestablishment. On May 1, 2007, Bernhardt sent an email to Downing stating that TSA had determined not to reestablish a relationship with OSF.

Timken is the only customer that has generated any sales for which TSA is entitled to commissions. However, TSA says that OSF has received requests for quotations with regard to several programs TSA worked to procure for OSF. Under the terms of the 2005 Agreement, TSA says it is entitled to commissions if any sales occur

7

within the post-termination period covered by the 2005 Agreement.

On July 16, 2008, TSA filed a second case ("the 2008 Action") in Wayne County Circuit Court claiming breach of the 2003 Agreement by improperly applying the monthly cap from the 2005 Agreement. TSA seeks damages in the amount of $10,614.05 plus the double damages penalty available under the SRCA, for total damages of $21,228.10. TSA also seeks attorney fees as provided under the SRCA and costs.

On August 4, 2008, OSF removed the 2008 Action to federal court on the grounds of diversity. TSA filed a motion to remand. The Court denied the motion and consolidated the 2007 Action and the 2008 Action.

### III.  Legal Standard

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Rather, the nonmoving party must

present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50. Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings. Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255. Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted. Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

## IV. Analysis

### A. Whether TSA Breached the 2005 Agreement

OSF argues that summary judgment is appropriate on Count I of TSA's complaint because the facts undisputedly show that TSA breached the 2005 Agreement based on Bernhardt's actions at the dinner meeting. As noted above, the 2005 Agreement provides that TSA "shall not conduct itself in any manner . . . detrimental to [OSF's] best financial, legal, and commercial interest." The 2005 Agreement also provides that the agreement may be terminated

> . . . by either party by reason of any material default of the other party (other than itself) in discharging or performing the duties and obligations of [sic] hereunder; provided; however, that if the defaulting party shall, within thirty (30) days after receipt of written notice of such default from the non-defaulting party, cure such default, than the right of termination provided for in this subparagraph shall be of no effect.

The question is therefore whether Bernhardt's conduct at the dinner meeting

9

constitutes a "material default" resulting in justified termination.  OSF says that because TSA undisputedly owes a duty of loyalty to OSF, it is never in a company's best interest to threaten to sue one of the company's largest customers, expose "dirt" on its employees, or otherwise offended them.  TSA says the record does not show as a matter of law that Bernhardt's actions constituted a material default and even if they were, OSF had a duty to provide TSA with written notice and an opportunity to cure.

Michigan courts looks to the Restatement for determining what constitutes a material breach.  See Walker & Co. v. Harrison, 347 Mich. 630, 635 (1957).  Section 275 of Restatement of the Law of Contracts sets forth the following factors:

> 'In determining the materiality of a failure fully to perform a promise the following circumstances are influential:
> '(a) The extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated;
> '(b) The extent to which the injured party may be adequately compensated in damages for lack of complete performance;
> '(c) The extent to which the party failing to perform has already partly performed or made preparations for performance;
> '(d) The greater or less hardship on the party failing to perform in terminating the contract;
> '(e) The wilful, negligent or innocent behavior of the party failing to perform;
> '(f) The greater or less uncertainty that the party failing to perform will perform the remainder of the contract.'

Here, although the general facts in terms of what Bernhardt said to Marado at the dinner meeting are undisputed, OSF does dispute Marado's questioning of Bernhardt about his relationship with OSF.  Moreover, the parties dispute the reasonable inferences which may be drawn from the facts, particularly given the state of the record.  OSF flatly states that Bernhardt's conduct was a material default.  However, OSF did not immediately terminate TSA, but rather suggested TSA stay away from Timken and

offer an apology.  Moreover, Downing admits that OSF's business with Timken did not suffer as a result of Bernhardt's comments.  As noted above, Marado was not responsible for purchasing on behalf of Timken but rather was a sales representative for Timken who sold product to OSF.  TSA's theory is that the dinner meeting was orchestrated by Marado of Timken and Billups of OSF to question Bernhardt with the ultimate goal of removing him from the Timken account.  Downing admitted that he had been approached on prior occasions by OSF personnel about removing TSA from the relationship between OSF and Timken so that Timken and OSF could share the commission saving.

Additionally, Bernhardt also says that on the morning of the dinner meeting, Billups forwarded him an email in which Marado referred to Bernhardt as her "bitch."[2] Marado denies sending an email.  Bernhardt, however, says that he forwarded the email to Marado and copied Billups, making some comments about the details of the dinner meeting.  Bernhardt says that Marado called him after he sent her the email and sounded "somewhat flustered" that Billups had forwarded Bernhardt her email since her comment was intended only for Billups.  Bernhardt says he told Marado not to worry about it.  A reasonable jury could conclude that TSA's theory is correct and that Bernhardt's conduct, while not appropriate, did not rise to the level of a material default.

TSA has also retained an expert witness, Terrence A. Barr, an attorney and president of a sales representative firm in the automotive industry.  Barr has submitted

---

[2]As will be explained more fully in the memorandum and order addressing the parties' motions for sanctions, this email has not been located.  Assuming solely for purposes of summary judgment that it did exist, where the facts must be viewed in a light most favorable to TSA, it provides support for TSA's position.

an expert report in which he opines that Bernhardt's comments were more typical of a heated exchange and did not amount to a material default, noting that Marado was not a buyer from whom Bernhardt would be seeking business for OSF. Barr also opines that TSA was terminated in order to save money and seized on the dinner incident to terminate the 2005 Agreement before it naturally expired. While OSF says that it intends to file a motion to strike Barr's opinion on Daubert grounds, the report is part of the record at this time and provides additional support for a finding that it cannot be said as a matter of law that Bernhardt's conduct constituted a material default.

Finally, even assuming Bernhardt's conduct was a material default, the 2005 Agreement expressly provides the party an opportunity to cure the default. Here, OSF says that TSA took no steps to cure the default. This argument ignores the undisputed fact that OSF specifically instructed TSA not to contact Timken other than to have Bernhardt apologize to Marado, which he did. TSA did everything it was requested and permitted to do by OSF in order to cure the alleged default. Thus, summary judgment is not appropriate on whether TSA breached the 2005 Agreement.[3]

B. Whether the SRCA Applies to TSA's Claim For Commissions

OSF also argues that summary judgment is appropriate on Count III of TSA's complaint alleging breach of the SRCA because TSA's commissions due to sales to Timken was compensated on a fixed "per piece" rate rather than as a percentage of

---

[3]TSA also argues that Bernhardt's conduct at the dinner meeting should not be considered a material default because to do so would result in a forfeiture out of proportion with the alleged default. The Court need not consider this argument in light of concluding that a factual dispute exists on whether Bernhard's actions constitute a material default. This argument is more appropriate at trial.

12

sales for all parts sold to Timken. In Count III, TSA asserts a claim for the penalty damages and attorney fees available under M.C.L. § 600.2961 when a principal intentionally fails to pay commissions when due. M.C.L. § 600.2961(5). The statute defines a "commission" as follows:

> (a) "Commission" means compensation accruing to a sales representative for payment by a principal, the rate of which is expressed as a percentage of the amount of orders or sales or as a percentage of the dollar amount of profits.

OSF argues that because the statute clearly provides that a commission is expressed as a percentage, excluded from coverage are commission arrangements where the commission is paid on a "per part" or "per piece" basis. This presents a question of statutory interpretation. TSA says that the evidence shows that at least a substantial portion of TSA's commissions for Timken were expressed on a percentage basis. TSA does not address the statutory question other than to state that at least some of its commission was paid on a percentage basis.

The statute defines commission to mean the "rate of which is expressed as a percentage of the amount of orders or sales or as a percentage of the dollar amount of profits payment on a percentage basis." This text clearly contemplates a commission being paid on a percentage basis. A fundamental principle of statutory construction is that "a clear and unambiguous statute leaves no room for judicial construction or interpretation." Coleman v. Gurwin, 443 Mich. 59, 65, 503 N.W.2d 435 (1993). The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended. Sun Valley Foods Co. v. Ward, 460 Mich. 230, 596 N.W.2d 119 (1999). When a legislature has unambiguously conveyed its intent in a statute, the statute speaks for itself and there is no need for judicial

construction; the proper role of a court is simply to apply the terms of the statute to the circumstances in a particular case. <u>Turner v. Auto Club Ins. Ass'n</u>, 448 Mich. 22, 27, 528 N.W.2d 681 (1995).

Here, clear language of the statute evinces no textual intent to include in the definition of commission a payment on a "per part" or "per piece" basis. That would appear to end the matter. Courts have been unwilling to read into SRCA matters which do not appear in the text. See <u>Kenneth Henes Special Projects Procurement, Mktg., & Consulting Corp. v. Continental Biomass Indus.</u>, (<u>In re Certified Question</u>), 468 Mich. 109 (2003) (refusing to read good faith defense into SRCA where none was expressed by the language in the statute). Neither party has cited any legislative history to aid in the construction. Moreover, neither party has cited any case law dealing with the definition of "commission." Persuasively, OSF states:

> . . . among the thirty-three states that have adopted sales representative commission statutes, ten states define "commission" to include compensation expressed both as a percentage of orders or sales as well as compensation derived on a "piece price" basis. *See* ARIZ. REV. STAT. ANN. §44-1798(1)(a)-(b) ("'Commission' means compensation…which is expressed as a percentage of the dollar amount of orders or sales *or any other method.*…")(emphasis added); GA. CODE ANN. §10-1-700(1) ("'Commission' means compensation accruing to a sales representative…the rate of which is expressed as a percentage of the dollar amount of orders or sales *or as a specified amount per order or per sale.*") (emphasis added); KY. REV. STAT. ANN. §371.370(1) (same); MD. LABOR AND EMPLOYMENT CODE ANN. §3-601(b)(2) ("'Commission' means compensation that: …(I) a specified amount for each order or sale…."); MO. REV. STAT. ANN. §407.911 (defining "commission" as "compensation accruing to a sales representative…the rate of which is expressed as a percentage of the dollar amount of orders or sales, *or as a specified amount per order or per sale.*") (emphasis added); N.J. STAT. ANN. § 2A:61A-1(a) (same); N.C. GEN. STAT. ANN. §66-190(1) (same); OR. REV. STAT. ANN. §646A.097(1)(a) (same); S.C. CODE ANN. §39-65-10(1) (same); VA. CODE ANN. §59.1-455 (same).

OSF's brief at p. 15-16. Michigan's failure to include in the definition of "commission"

14

language indicating payment on a "per part" or "per piece" method or "any other method" precludes a finding that a "commission" covered by the SRCA includes a commission paid on a per part or per piece basis. The legislative intent supported by the text was to restrict the meaning of commission to only the type of compensation described in the statute - compensation expressed as a percentage of sales or profits.

Applying this construction, OSF says that Count III fails because all of TSA's commissions on Timken were paid on a per part basis. OSF cites Bernhardt's deposition testimony in support. TSA denies this and points to attachment B to the 2005 Agreement contains a list of Timken parts. Under the heading "Agent Target Commission," there are listings for <u>both</u> a commission based on a "per piece" price and a percentage base. Specifically, 17 of the 32 Timken parts have compensation expressed as a percentage. TSA also says that portions of Bernhardt's testimony about compensation on a per piece basis is directed at compensation in 2004, prior to the execution of the 2005 Agreement. OSF denies this and says that despite Attachment B, the parties agreed that TSA would be compensated on a per piece basis for all of Timken. Notably, OSF points to TSA's March 13, 2008 compensation statement which confirms <u>all</u> compensation, even compensation after 2005, is made on a fixed per piece basis. The statement includes compensation from 2003 though March 2008. Beginning in August 2004, the "qty. shipped (pieces)" column multiplied by the corresponding "TSA Commission ($/piece)" column always equals the corresponding amount in the "commission earned by TSA ($)" column. TSA even calculated its damages for unpaid pre-termination commissions using the "per piece" method. Bernhardt, however, said at deposition that all prior commission statements were wrong because they failed to

include a commission on a percentage basis and that they had been "replicating an error for a couple of years." Bernhardt's testimony and Attachment B to the 2005 Agreement are sufficient to create a genuine issue of material fact as how TSA was compensated for its work on the Timken account. As such, summary judgment is not appropriate on Count III. However, at trial should the finder of fact determine that TSA was paid solely on a "per piece" basis for Timken work, then TSA would not have a claim under SRCA.

C. Whether TSA's Claims for Commissions Due on Accounts Other Than Timken Are Actionable

OSF says that to the extent TSA is seeking commissions on sales OSF made to companies other than Timken, including Cobra Metal Works for the Takata "blank" project, MFC for the "408" project, General Automation for the "Bosch guide" project, and MVS for the "sun gears" project, TSA has no claim because OSF has not made any sales to these companies. TSA acknowledges that OSF has not made any sales, but says it may have a claim because OSF has received requests for quotations (RFQ) from several of TSA's other customers prior to termination, including Metal Forming & Coining, Magna, MacLean Vehicle Systems, Metform, and PR machine Works.

Both parties' arguments are premature. Under the 2005 Agreement, TSA is entitled to post-termination sales commissions for any parts sold for which there was a RFQ prior to the termination of the agreement, on sales invoiced through the date which is three years from the effective termination date. The fact that OSF has not made any sales to other companies TSA was working on obtaining for OSF does not mean that TSA is not entitled to commissions _if_ OSF sells any parts to those companies relative to

the RFQ during the three-year post-termination period.  In such a circumstance, TSA would be entitled to commissions.  Accordingly, summary judgment is not appropriate.

## V.  Conclusion

For the reasons stated above, genuine issues of material fact remain surrounding the circumstances of TSA's termination and whether OSF breached the 2005 Agreement.  OSF's motion for summary judgment is DENIED.

SO ORDERED.


                 s/Avern Cohn  
                AVERN COHN  
                UNITED STATES DISTRICT JUDGE

Dated:  March 19, 2009


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, March 19, 2009, by electronic and/or ordinary mail.

                 s/Julie Owens  
                Case Manager, (313) 234-5160