UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TECHNICAL SALES ASSOCIATES, INC.,

    Plaintiff,

v.                                                    Case Nos. 07-11745, 08-13365

OHIO STAR FORGE CO.,                   HONORABLE AVERN COHN

    Defendant.

_____/

**MEMORANDUM AND ORDER
DENYING DEFENDANT'S MOTION FOR CONTEMPT
AND
GRANTING PLAINTIFF'S MOTION FOR SANCTIONS**

I. Introduction

This is a dispute over sales commissions which is the subject of two consolidated cases. Plaintiff Technical Sales Associates, Inc. ("TSA") is suing defendant Ohio Star Forge Company ("OSF") claiming a breach of a 2003 Sales Representative Agreement ("2003 Agreement"), case no. 08-13365, and a breach of a 2005 Sales Representative Agreement ("2005 Agreement"), case no. 07-11745.

Before the Court is TSA's motion for sanctions for destruction of electronic evidence and OSF's motion for contempt sanctions against TSA and Midwest Data Group, LLC (Midwest) for violations of the order allowing a computer forensic examination as well as a protective order.[1] These motions pertain to a forensic

---

[1] Also before the Court is OSF's motion for summary judgment which is the subject of a separate order.

computer examination, which was conducted by Midwest on OSF's computer system, that revealed that approximately 70,000 files were deleted from an OSF employee's computer and email folders were moved to a recycle bin on the same employee's new computer during the pendency of this litigation.

For the reasons that follow, OSF's motion for contempt is DENIED and TSA's motion for sanctions is GRANTED.

## II.  Background

### A.

TSA's motion is premised on the grounds that a forensic computer examination of OSF's computer files by Midwest revealed that numerous files were deleted. The purpose of the examination was to locate emails between Annette Marado and Pat Billups and between Billups and Lawrence Bernhardt immediately prior to and after "the dinner meeting."[2] In particular, TSA was looking for an email from Marado to Billups, which Billups forwarded to Bernhardt, in which Marado referred to Bernhardt as her "bitch," hereinafter referred to as "the Marado email."

OSF's motion for contempt sanctions against TSA and Midwest is based on the argument that they violated the terms of the stipulated order regarding the examination as well as a general protective order.[3]

### B.

---

[2]The events of the dinner meeting are discussed in detail in the summary judgment order.

[3]Midwest is not a party to the case; however, it agreed to be bound by the terms of the order regarding the forensic examination.

During discovery, TSA requested OSF to produce any and all emails which Billups sent to or received from Marado concerning the dinner meeting, as well as any and all emails Billups sent to or received from Bernhardt.  As noted in the summary judgment decision, TSA believes that Marado and Billups orchestrated the dinner meeting to question Bernhardt about his relationship with Timken and eventually have TSA removed from the relationship so that OSF and Timken could share in the cost savings by eliminating TSA's commissions.  Bernhardt says he is certain that emails were exchanged between these three parties in the day immediately before the dinner meeting.  Bernhardt specifically recalls receiving the Marado email.  OSF did not produce any responsive documents.

Because TSA was certain of the existence of emails, TSA requested an examination of OSF's computer system.  The parameters of the examination are set forth in a Stipulated Order Regarding Forensic Examination of Defendant's Computer System (Stipulated Order), filed October 23, 2008.  Basically, Midwest was to make mirror images of OSF's system hard drive and Billups' computer.  As will be explained, Midwest searched two computers used by Billups.  Midwest then performed a key word search to locate any emails during the time from September 21, 2006 to October 19, 2006 containing the terms "bitch," "Bitch," "my bitch," mybitch."  The search was also to include any emails during this time period which included the TSA logo or letterhead for the purpose of locating documents containing the bitch terms.  After completing the search, Midwest was to provide copies of all "emails, documents, or other electronically stored information" meeting the search criteria to OSF's counsel for review. OSF's counsel was then give TSA's counsel a log identifying any "emails, documents, or other

electronically stored information" which OSF contends is not privileged as well as a printed copy of such information. Midwest was also to provide an acquisition report to OSF detailing the server and computer data that was captured and a list of all file names extracted from the search. Midwest was not to disclose the report to TSA.

Midwest conducted an examination at OSF from October 27 through October 30, 2008. Midwest conducted the keyword search and made the relevant copies from OSF's system hard drive. However, Midwest found no emails, documents, or other electronically stored information meeting the search criteria. Midwest says that it provided Randall Poland (Poland), OSF's Information Systems Technician, a copy of the acquisition report and allowed Poland to photograph the approximately six screen shots that comprised the report and gave Poland time to inspect the report.[4]

Midwest, in preparing to perform the required searches on the mirror image of the hard drive on Billups' first computer, detected that approximately 70,000 files had been deleted in April 2008 (during the discovery period in this litigation) using a tool known as "Eraser." Midwest also determined that files on the hard drive on the computer Billups currently uses, had been moved into the recycle bin of his email folder. Specifically, folders called "Pat's Personal Folder Mailbox" and "Pat's Mailbox" were moved to the recycle bin, beginning at 2:08 a.m. Friday, October 24, 2008, the day after the Stipulated Order was entered and days before the scheduled examination.

Upon these discoveries, Midwest drafted a report entitled "Examination Report of

---

[4]Midwest says it did not make mirror images of OSF's backup server because Poland informed Midwest that OSF did not begin to back up its email until December 2006. Because the Marado email predated this time, Midwest determined not to copy the back up tapes.

4

Findings" (Examination Report) and provided it to TSA on November 18, 2008.  Midwest did not believe the Examination Report violated the terms of the Stipulated Order.  Midwest did not give a copy of the report to OSF.  Midwest also sent an email to TSA's counsel, who confirmed that disclosure of the Examination Report to only TSA did not violate the terms of the Stipulated Order.

Upon receipt of the Examination Report, TSA filed the instant motion for sanctions.  TSA contends that by deleting some 70,000 files on Billups' previously used computer in April 2008, OSF has violated its duty to preserve electronically stored information.  TSA says OSF also violated its duty by deleting email folders from Billups current computer.  TSA requests that OSF be sanctioned in the form of (1) an award of the cost of the forensic examination in the amount of $17,786.25, (2) an award of TSA's reasonable attorney fees expended in connection with the computer forensic examination, and (3) an adverse inference jury instruction.

Upon receipt of TSA's motion, OSF filed the instant motion for contempt sanctions against TSA and Midwest.  OSF says that Midwest violated the Stipulated Order by failing to disclose the Examination Report and TSA violated the Stipulated Order as well as the protective order in this case by using the information to file its motion.

### III.  Analysis

#### A.  OSF's Motion for Contempt

It is appropriate to first consider OSF's motion and determine whether TSA or Midwest violated any Court orders.

As to Midwest, OSF says it "appears" that Midwest did not search the servers or

5

back up tapes and otherwise conducted an incomplete search for the Marado email. In support, it provides the Poland's Declaration. Midwest has filed a detailed response, coupled with the Declaration of Mark T. Vassel, president of Midwest, in which it details the steps it took in conducting the forensic examination and lines up those steps with each paragraph of the Stipulated Order. As to searching the back up tapes, Midwest explains that Poland informed them no back ups existed prior to December 2006. A review of the competing Declarations shows that the parties dispute whether Midwest conducted a complete search. OSF says that Midwest could have located the Marado email through other means, including searching the so-called deleted files in Billups' mailbox. While all of the discussion of forensic computer searching is interesting, it is irrelevant to the real issue with Midwest - whether its Examination Report should have been disclosed to OSF, not TSA.

The Stipulated Order clearly sets forth what information Midwest was required to disclose to OSF. That included (1) copies of all emails, documents, or electronically stored information meeting the search criteria, (see ¶ 12 of Stipulated Order) and (2) an acquisition report detailing the server and computer data that was captured and a list of the names of the files extracted from the search (see ¶ 13 of Stipulated Order). Midwest, however, did not obtain any data from the search, i.e. it found no emails, documents, or electronically stored information meeting the search criteria and captured no data. There is nothing in the Stipulated Order which required Midwest to disclose an absence of data to OSF or its conclusion that OSF had deleted data. However, Midwest says it did provide OSF with an acquisition report which contained screen images.

OSF, however, points to ¶ 16 of the Stipulated Order which states in part that "Midwest shall not disclose the mirror image, the copies of the backup tapes, or any documents or reports resulting from the search of the mirror image or copies of the backup tapes." Midwest says that the language "documents or reports" includes a report that no data was discovered and that data was erased. The Court disagrees. The Stipulated Order is clearly aimed at protecting the discovery of <u>actual data</u>, not the absence of data. Midwest did not discover any documents or reports resulting from the search of the mirror image. As a result, there were no such documents or reports to disclose. There is nothing in the Stipulated Order which requires Midwest to disclose the fact that it discovered OSF had deleted data from Billups' computers. In short, Midwest did not violate the Stipulated Order.

As to TSA, OSF argues that it violated the Stipulated Order and protective order by failing to mark the Examination Report confidential and further violated the orders by using the Examination Report in a publically filed brief. TSA says no violation occurred because the Examination Report reveals an absence of information and the destruction of information, neither of which is covered by the order. TSA also says that the protective order is aimed at disclosure of confidential information that could lead to competitive injury.

The Court agrees with TSA. The Examination Report does not include any of the types of information identified in the protective order as confidential or a trade secret or otherwise proprietary. The Examination Report simply states that Midwest discovered that both of Billups' computer work stations (the one he used at the time of the dinner meeting and his current one) had data which was deleted. It did not contain any emails,

documents, or electronically stored information meeting the search criteria which was to be treated confidential under the Stipulated Order.

Overall, neither TSA or Midwest violated the Stipulated Order or the protective order.

### B.  TSA's Motion for Sanctions

#### 1.  Parties' Arguments

As to TSA's motion, TSA says that the Examination Report conclusively establishes that OSF intentionally deleted electronic data during the pendency of this case and that such conduct is sanctionable.

OSF denies this and says that (1) if the Marado email ever existed, it would have been on Bernhardt's computer, as he said it was sent to him, but apparently it is not, (2) OSF did not destroy any evidence because the Marado email could still be found on OSF's computer on its server, backup server, or backup tapes or on the hard drive of Billups' computer.  OSF says that the fact that Midwest did not find the Marado email means it never existed or Midwest performed an incomplete search.  OSF also says that it performed a "more extensive" search of its computers than Midwest and did not discover the Marado email.  OSF also says that 70,000 files which were deleted on Billups' old workstation were done in the ordinary course of business because that computer had "severe operational issues" and that "all of the necessary files" were transferred to Billups' new computer workstation.  OSF also says that the files in Billups' email folders moved to the recycle bin and are not lost.  OSF further says that the Marado email is immaterial and TSA has not been prejudiced by any of OSF's actions.

In reply, TSA says it did not preserve the email because at the time Bernhardt

8

received it, the parties were not in litigation and AOL, Bernhardt's email provider, automatically deleted emails after three to four weeks of being sent. TSA also says that it attempted to obtain a copy of the Marado email from AOL, but was not successful. TSA further says that OSF improperly focuses on the issue of whether or not the Marado email existed, when the real issue is the fact that 70,000 files were deleted and some of Billups' email folders were moved to a recycle bin during the litigation.

### 2. Conclusion

The Court of Appeals for the Sixth Circuit has recently stated that "[a]s a general matter, it is beyond question that a party to civil litigation has a duty to preserve relevant information, including [electronically stored information], when that party 'has notice that the evidence is relevant to litigation or ... should have known that the evidence may be relevant to future litigation.'" John B. v. Goetz, 531 F.3d 448, 459 (6th Cir. 2008) (quoting Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001) and citing Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216-18 (S.D.N.Y.2003); The Sedona Principles: Best Practices, Recommendations & Principles for Addressing Electronic Document Production, Second Edition 11, 28 (The Sedona Conference Working Group Series, 2007), available at http:// www. thesedona conference. org/ content/ misc Files/ TSC_ PRINCP_ 2nd_ed _607.pdf.)). The Sixth Circuit goes on to say that "[i]It is the responsibility of the parties to ensure that relevant [electronically stored information] is preserved, and when that duty is breached, a district court may exercise its authority to impose appropriate discovery sanctions. Id. (citing Fed. R. Civ. P. 37(b), (e) LQ; see also The Sedona Principles, supra, at 70 (noting that sanctions should be considered only if the court finds a clear duty to preserve, a culpable failure to preserve and

9

produce relevant ESI, and a reasonable probability of material prejudice to the adverse party).

Here, TSA is correct that the issue is not whether the Marado email exists or whether Midwest conducted an inadequate search, a contention it vigorously denies. Rather, the issue is whether the fact that OSF deleted 70,000 files on Billups' old computer in April 2008 during the pendency of the litigation and whether the deletion of email folders from Billups' present computer just days before the examination, constitutes the destruction of electronic evidence.

In order to make a determination, it is helpful to exam the time line of events. TSA's brief in support of its motion contains a time line, most of which is repeated below.

> 1.  On July 27, 2007, Plaintiff's First Set of Document Requests to Defendant was served by TSA on OSF. See Exhibit B.[5]  Among other things, TSA requested OSF to produce a copy of any and all emails which Pat Billups sent to or received from Annette Marado:
>> 11. Produce a copy of any and all correspondence (including emails) which evidence, concern, or relate to any communications between Pat Billups and Annette Marado between August 1, 2006 and the present date.
> See Exhibit B, p. 5.
>
> 2.  On or about October 1, 2007, Ohio Star Forge Co.'s Response to Plaintiff's First Request for Production of Documents was served on TSA by OSF. See Exhibit C. In response to Request #11, OSF set forth a few objections and then stated, "Subject to the objections, responsive documents, if any, will be produced." Id.
>
> 3.  On or about October 5, 2007, OSF produced numbered documents OSF00001 through OSF00645. See Exhibit D. The documents produced by OSF did not include any email communications between Mr. Billups and Ms. Marado.

---

[5]The Exhibit references are to TSA's exhibits filed in support of its motion.

4. On December 31, 2007, TSA's counsel sent an email to OSF's counsel which, among other things, specifically addressed OSF's failure to produce any of the email communications between Mr. Billups and Ms. Marado. See Exhibit E, ¶ 3. The email indicated that TSA was primarily concerned with email communications relating to the October 2006 dinner meeting which allegedly provided the basis for the termination of the Agreement.
Id.

5. On January 29, 2008, OSF's counsel responded with an email which indicated that approximately 40 additional pages of documents would be produced. See Exhibit F.

6. On January 31, 2008, OSF produced additional documents number OSF 00646 through OSF 00719. See Exhibit G. Although the additional documents included some email communications between Mr. Billups and Ms. Marado, no email communications were produced for the time period of September 28, 2006 through October 17, 2006. (The dinner meeting had taken place on October 5, 2006.)

7. On February 13, 2008, TSA's president, Mr. Laurence Bernhardt was deposed by OSF. During the deposition Mr. Bernhardt testified that on the date of the October 2006 dinner meeting he received a forwarded email from Mr. Billups at OSF in which Timken's Annette Marado had referred to Mr. Bernhardt as her "bitch":
. . .
See Exhibit H, Bernhardt Dep. 2/13/08, pp. 58-59.

8. On February 14, 2008, TSA's counsel sent an email to OSF's counsel which noted that no emails had been produced concerning the October 2006 dinner meeting, and requested that OSF confirm whether or not any such emails existed. See Exhibit I.

9. On February 29, 2008, TSA served its Notice of Rule 30(b)(6) Deposition of Defendant on OSF. See Exhibit J. Among other things, the deposition notice identified OSF's document retention policy as one of the subjects for examination. The notice also included a request for documents to be produced at the deposition, including any and all communications and emails between Mr. Billups and Ms. Marado from August 1, 2006 through the date of the deposition. Id. at pp. 4-5.

10. On March 7, 2008, after OSF objected to the document requests contained in the Rule 30(b)(6) deposition notice as untimely, TSA's counsel sent an email to OSF's counsel explaining that most of the documents covered by the request had been requested well in advance of the discovery cut-off date. See Exhibit K. The email also reiterated the fact that OSF had failed to produce any emails

between Mr. Billups and Ms. Marado concerning the October 2006 dinner meeting.  See Exhibit K discussion regarding "Request No. 5".

11.  On March 7, 2008, OSF's counsel responded with an email indicating that he would be meeting with his client the following week to discuss the document requests, and further indicating that OSF would endeavor to produce any additional responsive documents prior to the deposition.  See Exhibit L.

12.  On or about March 24, 2008, OSF produced additional documents, this time in response to Plaintiff's Third Request for Production of Documents to Defendant.  See Exhibit M.  The documents produced by OSF included approximately 90 additional pages of emails between Mr. Billups and Ms. Marado, but again did not include any emails from the weeks immediately before or after the October 2006 dinner meeting.

13.  On April 11, 2008, the Rule 30(b)(6) deposition of OSF was completed. No additional emails between Mr. Billups and Ms. Marado were produced by OSF at or before the deposition.  During the deposition, OSF's President, Mr. Jeffrey Downing, testified that OSF had no formal document retention policy concerning emails, and that he did not know whether the company had any rules that required emails and other communications to be preserved after the lawsuit was initiated.  See Exhibit N, Downing Dep., pp. 5-6.

14.  On April 22, 2008, TSA's counsel sent an email to OSF's counsel indicating that TSA wished to depose "the person in charge of I.T. at OSF", and further indicating that TSA would like to conduct a forensic examination of the computers used by Mr. Billups.  See Exhibit O.

15.  In late April 2008, TSA retained Midwest Data Group, LLC (hereinafter "Midwest") to conduct a computer forensic examination of TSA's computers and OSF's computers to locate any emails relating to the October 2006 dinner meeting.  In May 2008, Midwest completed the forensic examination of TSA's computers, but was unable to locate the subject emails.  The examination of TSA's computers cost $2,700.00.  See Exhibit P.

16. Over the course of the next six months, from April through October, counsel for TSA and OSF negotiated a Stipulated Order Regarding Forensic Examination of Defendant's Computer System, which was eventually entered by the Court on October 23, 2008.  See Exhibit Q.  The order set forth the parameters for Midwest's examination of OSF's computer system, including the computers used by Mr. Billups.

17.  During the process of negotiating the order, several drafts of the proposed order were exchanged, and Midwest was called upon to review the various drafts, and to provide input regarding the parameters for the examination. During

this time period, Midwest billed TSA an additional $2,261.25. See Exhibit R.3

18.  Beginning on October 27, 2008, Midwest conducted its forensic examination of OSF's computer system, including the computers used by Mr. Billups.

19.  During the forensic examination, Midwest examined two separate personal computers which had been used by Mr. Billups, his current computer and the computer he had been using in 2006.  Among other things, the examination revealed that a file wiping program had been installed on the older computer, and that somebody had deleted or altered nearly 70,000 emails to prevent them from being read.  This file wiping apparently occurred in April 2008, long after TSA had requested the emails which Mr. Billups sent to or received from Ms. Marado.  With regard to Mr. Billups' current computer, the examination revealed that on October 24, 2008, just days before the forensic examination, somebody had deleted "Pat's Personal folder Mailbox" and "Pat's Mailbox".  A copy of the examiner's report is attached hereto as Exhibit S.  As the report's conclusion indicates, the deletion of the files was clearly intentional:
>  In conclusion, my analysis revealed the presence of a file wiping program on the older system used by Pat Billups (Dell PC2). Analysis on the Dell PC2 system (old system) revealed nearly 70,000 files, which were deleted/wiped to prevent recovery. Furthermore, my analysis uncovered on the Dell PC1 system (new system), the deletion of Pat's Mailbox, which occurred on 10/24/08.
>  The presence of nearly 70,000 altered files, installation of a file wiping utility, deletion of Pat's Mailbox clearly indicates to this examiner a willful intent to hide or destroy electronic evidence.
>  See Exhibit S, p. 2.

20.  On November 12, 2008, Midwest provided its final invoice to TSA in the amount of $12,825.00.  See Exhibit T.

Based on the above, it is difficult to find that OSF did not intentionally destroy electronic information on both of Billups' computers after such information was requested.  OSF knew that TSA was seeking emails between Marado and Billups, and was particularly interested in emails around the time of the dinner meeting, including the Marado email.  Yet, OSF allowed filed on both of Billups' computers to be deleted.

While OSF says, through the Declaration of Poland, that "all pertinent files were copied and relocated" to Billups' present computer, there is no way to determine if all of

13

the data on Billups' old computer was in fact transferred.  Moreover, while OSF says the deleted files were irrelevant, there is no way to determine relevance of deleted files.  According to Midwest, the use of the Easer program has resulted in the deleted files being overwritten with a series of zeros and there is no way to determine whether they were in fact copied to the new computer.

As to the removal of email folders on Billups' current computer to the recycle bin, while OSF says that this would not result in a loss of data, Midwest says otherwise.  Vassel, of Midwest, states in his declaration that the movement of the folders to the recycle bin could have resulted in the changing on dates of emails contained in those folders and would have the effect of moving the emails outside of the date restrictive keyword search for the Marado email.

Moreover, the timing of the destruction appears more than coincidental.  The 70,000 files on Billups' old computer were erased in April 2008 at about the same time TSA informed OSF that it wished to conduct a forensic examination.  The email folders on Billups' new computer were moved to the recycle bin at 2:00 am on Friday, October 24, 2008, the day before the examination.[6]  Under the circumstances, the Court finds that OSF's actions with respect to Billups' computer violated its obligation to preserve electronic evidence.

Finally, Fed. R. Civ. P. 37(e) does not provide safe harbor for OSF's conduct.  Fed. R. Civ. P. 37(e) states as follows:

> **(e) Failure to Produce Electronically Stored Information.** Absent

---

[6]There is no explanation as to the reason that the move of the emails folders to the recycle bin occurred during the middle of the night.  It is odd to say the least.

14

> exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system.

This rule is intended to protect a party from sanctions where the routine operation of a computer system inadvertently overwrites potentially relevant evidence, not when the party intentionally deletes electronic evidence. See, e.g., 8A Fed. Prac. & Proc. Civ. 2d § 2284.1. Moreover, TSA is seeking sanctions under the court's inherent authority which is appropriate. The authority to impose sanctions for spoliated evidence arises not from substantive law but, rather, "from a court's inherent power to control the judicial process." Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991).

The question then becomes the appropriate sanction, if any, for OSF's conduct. The Sixth Circuit has recently made clear that the determination of spoilation sanctions is governed by federal law and subject to the court's discretion. Adkins v. Wolever, __ F.3d __, 2009 WL 248682 (6th Cir. Feb. 4, 2009) (en banc). The Sixth Circuit also explained that

> [a]s our sister circuits have recognized, a proper spoliation sanction should serve both fairness and punitive functions. See Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 156 (4th Cir. 1995) (observing that a proper sanction will serve the "purpose[s] of leveling the evidentiary playing field and ... sanctioning the improper conduct"). Because failures to produce relevant evidence fall "along a continuum of fault-ranging from innocence through the degrees of negligence to intentionality," Welsh, 844 F.2d at 1246, the severity of a sanction may, depending on the circumstances of the case, correspond to the party's fault. Thus, a district court could impose many different kinds of sanctions for spoliated evidence, including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence. Vodusek, 71 F.3d at 156.

Adkins, 2009 WL 248682 at *2.

Here, OSF had an obligation to preserve electronic data, particularly emails on

15

Billups' computers.  It did not.  Emails and files were deleted at a time when the parties were in litigation and OSF was aware that TSA was seeking a forensic examination.  While it may never be known whether the Marado emails ever existed,[7]  OSF's conduct merits a sanction.  While the Court finds that a monetary sanction in the amount of the cost of the forensic examination appears to be appropriate, i.e. $17,786.25, the actual amount of the sanction as well TSA's entitlement to an adverse jury instruction will be determined at trial once the substantive harm caused by OSF's actions is known.

SO ORDERED.

s/Avern Cohn<br>AVERN COHN<br>UNITED STATES DISTRICT JUDGE

Dated:  March 19, 2009

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, March 19, 2009, by electronic and/or ordinary mail.

s/Julie Owens<br>Case Manager, (313) 234-5160

---

[7]TSA says that Timken may be a possible source for the email; however, it is not clear the extent to which TSA has pursued searching Timken's computer files.